JOHN L. OAKEY, appellant,

*v.*

EDMUND B. COOK, respondent.

On May 7th, 1883, C. and O. executed an agreement for the exchange of properties, "each party agreeing to furnish good titles, satisfactory to both parties." O. was to give C. $5,000, and to gather the wheat crop growing on C.'s farm, and to divide the proceeds with C. Each party took possession of the other's property at once, improved it and used it as his own. There were mortgages amounting to $17,000 on C.'s place and $8,000 on O.'s. C. agreed to remove $9,000 of his, and they had several amicable interviews in reference to these mortgages between May 7th and September 19th. On the latter date, O. notified C., in writing, that he rescinded the contract. C. declared himself ready to perform and tendered O. his deed on October 17th, which was refused by O., and on October 19th, C. filed his bill for specific performance.
*Held*—

(1) That the existence of the mortgages on C.'s place was not a violation of the stipulation as to a good title, so as to deprive him of the right to file his bill, but that it only required him to remove the encumbrance when the deeds should be delivered.

(2) That O.'s knowledge of the amount of those mortgages before June 16th, without prompt objection thereto, estops him from now asserting that C. concealed the amount, and thereby perpetrated a fraud on him.

(3) That O.'s attempted rescission allowed C. to bring suit without a tender.

(4) That an alleged material modification of the contract, which bound C., but not O., asserted for the first time by way of amendment to O.'s answer, after the testimony had all been taken, could not now be set up successfully by O.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions :

Oakey *v.* Cook.

This bill is for the specific performance of a contract for the exchange of lands. The complainant, Cook, owned a tract of land in Maryland; the defendant, Oakey, a mill property in New Jersey. In the spring of the year 1883, Oakey, in company with a trusted neighbor, visited Cook, with the view of examining his farm; spent two days with him, visiting the neighborhood and carefully inspecting the premises. They had a conversation about an exchange. In a few days, Cook visited Oakey in New Jersey; spent two days at least in the vicinity, and on May 7th, 1883, they entered into an agreement to exchange. I copy the agreement, namely:

"BLACKWELL'S MILLS, May 7th, 1883.

"This article is to certify that John L. Oakey, of the county of Somerset and state of New Jersey, and Edmund B. Cook, of the county of Somerset and state of Maryland, have this day exchanged properties, the exchange to be as follows: the said John L. Oakey to take the property in Maryland, now occupied by Edmund B. Cook, and the said Edmund B. Cook to take the property known as Blackwell's Mills, now occupied by said John L. Oakey, each party agreeing to furnish good titles satisfactory to both parties.

"Said John L. Oakey agreeing to give said Cook $5,000; also, to gather the wheat crop now in the ground, thresh and deliver one-half to shipping station not farther than depot at Westover, Cook furnishing bags for his part, without expense to said Cook for delivering at said station.

"John L. Oakey is to have the manure on both places, E. B. Cook to have the cord-wood now cut on the premises.

"JOHN L. OAKEY. [L. S.]
"ED. B. COOK. [L. S.]

"Signed, sealed and delivered in presence of
"LEWIS S. HOWELL."

Both premises were heavily mortgaged, Cook's with $17,000, Oakey's with $8,000. Very soon after the execution of the agreement, as well perhaps as before, the disposition of the mortgages became a subject of conversation, although it is not clear with what precise intent; but I think with the design of enabling each party to transfer the liabilities from their respective properties as held before the exchange to the properties as held after the exchange. The fact that these interviews took place, and the uncertainty of them as to intent and the results, should be kept in mind; not that the agreement was thereby altered or modified, or

any new rights created, but that they assist in coming to an understanding of the subsequent action of the parties. As the agreement was signed May 7th, Oakey went to Maryland May 9th, and was there until the 12th—on the farm with Cook. While he was there, Cook decided that he would make sale of his personal property on May 23d. One of Oakey's sons attended that sale. The next day, or the second day after the sale, Cook left Maryland with his family, and surrendered the possession of the farm to the son of Oakey; came to New Jersey, and by Oakey was put in possession of the mill property May 28th, 1883. Thus, within three weeks after the execution of the agreement, the parties thereto had exchanged full and complete possession of the premises referred to in the agreement. Oakey, by his son, commenced at once the cultivation of the farm, and Cook, in person, the running of the mill, a very large amount of work being done thereon by each.

The crops named in the agreement as being on the farm were all gathered and sold by Oakey; the gross market value was over $4,000. Cook received one-half of the proceeds of the wheat, according to the terms of the agreement; the wheat, less expenses, amounted to $1,663.22; the corn, $730.52; the cloverseed, $434.47; the hay, $342.59; the oats, $50.39; the rye, $80.33; and other products, $100. These values are thus presented to show that Oakey did a large amount of work, and that to have done it he must have been in good faith and must have intended to proceed with the contract on his part. Cook, on his part, did a large amount of work towards the actual improvement and increase of the value of the mill premises, which would seem to establish equal good faith on his part.

There being no time named in the contract for the exchange of titles, Cook says it was understood that this was to be effected about June 1st; Oakey says he did not exactly so understand it, but that it was to be done as soon as it could be so arranged. Evidently, then, time was not of the essence of the contract. According to Oakey's understanding, there was to be a mutual accommodation. Cook had a deed prepared and executed by

Oakey *v.* Cook.

himself and wife for his farm to Oakey before he left Maryland, and upon his arrival in New Jersey he showed it to Oakey.

In the month of June, Oakey had his mill property surveyed. He then had a deed prepared, but did not have it executed until August the 8th; Cook living all the time on the mill property and Oakey living on the adjoining premises, they saw each other and met frequently. Oakey says that between June 1st and August 8th, the day when he executed his deed, he had several interviews with Cook about fixing up the titles; he says they saw each other almost every day, and that on one of these occasions he said to Cook :

"I was ready and prepared at any time, and he said he wanted to fix up his property (the mill) a little and would. like to paint it, and wanted a man by the name of Van Duzer to come out and look at it, and he would like to get a loan of about $15,000 on the mill, and said if he could get it at one place it would make less per cent., and gave that as a reason for a little delay, and before I went down—I went down on the 16th or 17th of June—I went to Maryland, and before that we had a conversation, and he wished me to pay off that—the last mortgage—that was down there, and I thought that at that time I would do it, so I went prepared to do it when I went down."

But he, Oakey, did not pay off the last mortgage; he says, "I took legal advice about it." Oakey complains that Cook concealed from him the existence of this last mortgage. It is important to remember that he learned of it from him before June 16th and promised to discharge it. It is urged that in this there was fraud on the part of Cook, but it does not appear that Oakey attempted to get rid of the contract on that account until long afterwards. Evidently, if he intended to rescind, he should have decided to do so immediately. The reasonableness of the law on this subject commends itself to every one. *Bigelow on Fraud 184; Lawrence* v. *Dale, 3 Johns Ch. 23, 17 Johns. 437.*

While Oakey was on the farm in Maryland, Cook went there; they met, and Oakey says they had no talk about the mortgages, but did talk about gathering the crops. Oakey says Cook came to him about the 1st of August and asked him to pay the interest on one of the encumbrances, and that he told him he "would never pay another cent until the papers were fixed."

This is the first intimation of any special haste or desire for passing the title, that appears in the case. It is doubtful, however, if Mr. Oakey is correct as to the time, for it was some days after the 1st of August, before he had his deed prepared and executed; and there is no evidence of any especial haste or desire upon the part of either party after Oakey had his deed prepared and executed, until the 29th day of August, when Oakey took steps looking to the complete exchange of titles.

Oakey's son John returned from Maryland on a visit to his father, and on August 29th he and his father called on Cook. In his testimony, John says:

"We asked Mr. Cook if he was ready to fix this matter up; he said he was not; he hadn't seen his man from Philadelphia yet, or the man hadn't seen this place; I forget which were just his words, and my father said: 'Mr. Cook, it is time this is fixed up; I would like to get this fixed up now as soon as possible; I have the money and papers here with me;' and he took the money out and showed it to him."

He showed him $3,000 and the deed. Cook said:

"This is the first time you have been ready, is it not?"

Oakey said:

"You know, Mr. Cook, that is not so; I have been ready all summer, at any time."

The son says:

"He [Cook] said his man had been off to a watering place, and he had not been able to see him; I said, 'Mr. Cook, if you want to see that man, it is not but a two hours' ride to the watering place to see him; this matter must be fixed up; I want you to understand I am not going to put $700 in in winter grain and truck unless I know who is going to have title;' he said he would write; that is all the satisfaction we got; I told him if he would fix this matter up by September, by the time I went home, it would be all right, and if not, it would be all wrong."

Cook says that Oakey and his son were there, and that they

Oakey *v.* Cook.

said they would like to have it fixed up, but says also that they hadn't their searches, but would have them in a few days, but denies that the manner was at all positive, and says that Oakey never tendered him a deed. He denies that John said it must be fixed before he returned to Maryland.

After this interview, Cook and Oakey met at the mill again about September 13th. Oakey says he went to Cook, and talked to him about " fixing up this arrangement of ours. I had been ready, and wanted to know whether he had heard yet from Mr. Van Duzer. " He said he hadn't seen him yet; I told him I was tired of this, and then he said something about his sister being there, or something; I didn't get that very clear, all what he said, but I was a little vexed, and I said, 'Now you can do what you please, and I will do what I please, after this;' he said he had written Mr. Van Duzer, and had received no reply, and I told him it was the same old story, and I was tired of it." He says he asked him if he had made his arrangements with Mr. Van Duzer, "because the last conversation was, that he had written to Mr. Van Duzer, and he expected a reply from him." Six days after this, September 19th, Oakey sent a letter to Cook, which I copy:

" *To E. B. Cook, Esq.:*

"DEAR SIR—The contract of exchange requires each of us to furnish a good title, satisfactory to each of us. Your farm is mortgaged for about $17,000, and by the mutual agreement between us you were to remove the $17,000 of mortgages except the $8,000 which was to remain, and I was to leave the $8,000 on my mill I took possession of your farm and gave you possession of my mill, believing that you could, you would perform, and you have not. I consider the exchange at an end. You may put in the winter grain on the farm at once, and on the 1st day of January next, I will require of you the possession of my mill, and give you full possession of the farm. The time I have fixed so that you can work off your grain and I can dispose of my crops and stock without injury. My sons, as you know, are working the farm on shares, and they decline to go to the expense of putting in the winter grain, the mortgages being unpaid, and a foreclosure of which would sweep away the crops. Therefore, in consequence of the non-fulfillment of your promises, they have failed to make preparations for seeding the winter grain."

To this letter, Cook, by his counsel, two days after, September 21st, replied. After acknowledging the receipt of Oakey's letter, he says:

"The mutual agreement spoken of in your letter he says never was made. By the written contract, each property is to be clear, and you are to pay him $5,000. He is ready, at any time you are, to comply with its terms. Whenever you are ready to pay $5,000 and remove your mortgage, he will remove the mortgage on your place."

Cook says that he prepared a deed of conveyance for his farm from himself to Oakey, and showed it to Oakey, and tendered himself ready to carry out the contract immediately after the contract was executed, and Oakey said he was not ready. Again, October 17th, he handed his deed to Dr. Ribble, and sent him and another to Oakey to tender the deed to Oakey. They went, and made known to Oakey the object of their visit, telling him that they had a deed to tender to him, and asking him if he wished to look at it, when he told them it was too late, he didn't wish to talk about it. Two days after this the complainant Cook filed his bill.

The testimony discloses the fact that while the agreement bound each party to give to the other a "good and satisfactory deed of conveyance," after the execution of the agreement, they had several interviews respecting the disposition of the mortgages. I think it matters not to what precise end the interviews tended; certainly they showed mutual indulgence. Each seemed willing to try and help or accommodate the other. These things are sustained by the allegation of the answer and by the testimony of both parties. Indeed, I can discover nothing but the mortgages on the one side or the other that at all hindered the exchange of titles as well as of possession. The greater delay was occasioned by the greater difficulty which Cook encountered in providing for the mortgages on his farm. This difficulty was occasioned by the absence of a personal friend on whom he relied for aid, which fact was made known to Oakey and was fully understood by him.

The bill alleges that Cook was ready and willing, October

Oakey v. Cook.

17th, to carry out the contract, and so declared himself when Oakey said "it was too late." The bill also alleges that Cook is still ready and willing to complete the contract.

The answer says that Oakey was ready and anxious to complete the contract September 19th, when he undertook to rescind it, because he was satisfied that Cook was unable to complete it on his part.

Oakey and his son called on Cook August 29th, and said he was ready, and wanted Cook to be ready before the son returned to Maryland. Oakey called again about September 13th, and expressed his anxiety to have the contract carried out. September 19th, he gave notice of his rescission of the contract. September 21st, Cook's counsel wrote to Oakey and offered to perform the contract.

On October 17th, Cook tendered his deed to Oakey and declared his readiness to complete the contract, when Oakey said "it was too late." On the 19th of October, Cook filed his bill.

After a very careful consideration of the able arguments of counsel on both sides, and a patient review of the facts, as detailed in the testimony, I am impressed with the conviction that this contract ought to be enforced, unless it appears that Cook is himself shown to be seriously at fault.

It should be remembered that both parties are vendors, and both purchasers. It should also be remembered that each has surrendered possession of the property which he sold, and taken possession of the property purchased. Under the agreement above set forth, nothing remains to be done except the exchange of the conveyance of title.

The first ground of resistance to this bill is the alleged inability of Cook to complete the contract. It is said that although he sets out a contract which requires each to give to the other a title, good and satisfactory, and then alleges a tender and a present readiness, yet the fact is, as is shown in the case, that there are $17,000 worth of encumbrances on Cook's farm. It is urged that this fact is a complete answer to the demands of Cook, and must certainly defeat his suit. The reason urged is that the contract requires a good and satisfactory title, which, it is claimed,

is impossible with the mortgages named resting on the land, since, as is also claimed, Cook cannot remove them. The well-settled doctrine that equity will not compel a purchaser to take a doubtful title is relied on, citing *Vreeland* v. *Blauvelt, 8 C. E. Gr. 483; Cornell* v. *Andrews, 8 Stew. Eq. 7; Dobbs* v. *Norcross, 9 C. E. Gr. 327.*

I think it will be observed that in each of these cases the defect which supported the defence was a flaw in the complainant's own title; a flaw which antedated his own title, and over which he had no control, and was not an encumbrance created by himself, and which he could remove or discharge by any action of his own, as could be done in this case by the mere payment of the mortgages.

But the defendant meets this resort, and cites authorities showing that a mortgage uncanceled of record is a good objection. *Young* v. *Collier, 4 Stew. Eq. 444.* This case, however, scarcely seems to be fully in point, since, although the mortgage which was uncanceled of record had evidently been paid, and the taxes which were unpaid at the time were not named as a cause of resistance when the tender was made, the defence consequently failed on both grounds. The general principle announced in this case none will dispute. The general doctrine that a clouded or encumbered title will not be forced upon a purchaser, is admitted in its broadest scope; but the insistment is that it has no application to this particular case.

Cook urges that the rights and obligations between him and Oakey were mutual and dependent, and that it was and is enough for him to tender his deed and offer to fulfill his covenants when Oakey should do so also. That in this respect the obligations of the parties are dependent cannot be questioned; I think every case in which the subject has been discussed goes upon this principle. But the material inquiry is, How far can Cook support himself under all the circumstances of the case? What are the letter and spirit of the agreement? That each will convey, by a good and satisfactory title, is the letter; that each will remove the encumbrances at the time of the conveyance, and not before, is plainly the spirit. From the commencement

of their negotiations until the 13th of September there does not seem to have transpired a single thing between them that did not imply this. Indeed, Oakey most evidently so understood his own obligations, for at no time did he remove the mortgages from the mill property ; and when he tendered his deed and the $3,000, the mill property was encumbered to the extent of $8,000. And what is more, whether Oakey understood that the mortgage was to remain or to be discharged by him, it appears that some time before he made his tender, he endeavored to negotiate the transfer thereof to the Maryland farm.

It will not be out of place, in this connection, to consider the condition of the title at the time the agreement was executed. So far as has been developed, each had the title to his premises in fee simple, unencumbered by any prior lien, and unaffected by any prior or superior claim or interest, at the date of the conveyance under which he held ; but each had encumbered his title by mortgages, the existence of which was a serious impediment to a complete and speedy exchange from the very inception of the negotiations. Perhaps there was nothing else whatever in the path to an exchange of conveyances on the day that the agreement was delivered, unless it was that Oakey did not have the $5,000 which he agreed to pay. But so certain were they of a mutual accommodation that they made their agreement as though no mortgage beclouded either property, and in a few days surrendered the absolute and unqualified possession, each to the other ; each beginning and carrying forward extensive operations incident to the particular avocation in which he thus became engaged, as though every thought or conception in connection with their agreement had been realized. To effect this and to advance their mutual interests, as they were then regarded, Cook sold all his stock and farming utensils in Maryland, and Oakey gave up a valuable milling business which he had been conducting for years. I repeat that all this was done before the deeds were tendered, and in the face of the fact that both titles were heavily encumbered.

These considerations are of great importance in determining how far Cook can be protected by the principle that in the case of

dependent covenants neither party is obliged to perform until the other does. These considerations are also of great importance in determining to what extent time should be allowed to protect Oakey from fulfilling his obligations.

Equity regards the situation and circumstances in which parties mutually and voluntarily place themselves. In this case each encouraged the other in the steps taken from time to time, until thereby their rights and interests were very materially changed. Each saw and understood the situation and embarrassment of the other from the first. It is true Oakey says that he did not understand the extent of the encumbrances on Cook's farm, but he also says that the mortgages had nothing to do with the trade. However, he soon was fully apprised of the mortgages and made no objections on that score until he sought to avoid the completion of the contract. His failure to stand at once on that objection would seem to close his mouth now, as I have before stated. However, it should be noted that if this put the case in a serious light as to the complainant, before it can prevail against him that he in any sense misled the defendant, the allegation must be clearly proved. The burden is on the defendant. *Park* v. *Johnson, 4 Allen 259.* Which requirement I think he has not met. Cook says if he told him anything with respect to the amount of mortgages, he told him the truth; and this would be most reasonable indeed, since it would have a tendency to enhance the value of his property in the estimation of the purchaser for the purchaser to know that business men were willing to take it as a security for their money to so large an amount.

But I have said the embarrassments of the parties were mutual, and that each seemed desirous to aid the other at his efforts towards relief. To effect this relief, time was essential; not so much a fixed time, when, at all hazards, the contract must be performed or rescinded, but the duration of time, so that the purposes, intentions or desires of the parties might be accomplished, and thus the contract performed. Hence, it is seen that Oakey said to Cook that he had a good many uncollected accounts on his books, which he might be delayed in collecting,

Oakey *v.* Cook.

and that he might desire to leave $10,000 on the mill rather than $8,000, to which Oakey says Cook replied "all right." This, and many other similar circumstances, show that they waited upon each other from the first; until, at least, the 29th day of August, when Oakey tendered a deed and $3,000, but made no provision whatever for the other $2,000 which he was to pay, either in securing it by mortgage, or otherwise. After the exchange of possession not a single step was taken by either towards complying with the contract, which in the least increased his embarrassments, or in the slightest degree altered or affected the rights of either. Cook prepared his deed within a few days after the contract was signed, and exhibited it to Oakey within a few days after he took possession of the mill, but took no other decisive steps until in October, in the meantime, however, negotiating, as Oakey knew, for such loans as would enable him to make the title which he had sold "good and satisfactory."

At the time of the execution of the contract, and of the exchange of possession, Cook was uncertain as to the exact boundaries of the land which he had agreed to convey; these he ascertained, by actual survey, in the month of June, soon after which his deed was prepared, but which was not executed until in August. As has been seen, Oakey took no decisive step until the 29th of August, when, besides tendering his deed and offering the $3,000, his son John warned Cook that he must be ready before he (the son) returned to Maryland. The next decisive or emphatic step taken by Oakey was three weeks later, September 19th, when he wrote the letter to Cook, which is above copied, in which he said he considered the contract at an end.

After what has been said, I need scarcely observe that during all the time, until August 29th, Oakey was in the same plight as Cook. A large mortgage covered his mill property. Nor had he removed this encumbrance August 29th, when he attempted to hasten affairs by a partial tender, nor yet September 19th, when he declared the contract rescinded.

Hence it is very plain that when the contract was signed the parties were not ready to complete the exchange. It is equally

plain that from that time until September 19th they were wait-
ing on each other, neither being ready in the sense contemplated,
not by the terms of the written agreement, but by the terms of the
parol understanding that each was to accord to the other time to
provide a way to discharge the mortgages, and so to become enabled
to perform the written contract. And therefore, when Oakey
conceived that Cook ought to be ready, considering the length
of time which had elapsed, he tendered a deed, wholly overlook-
ing his own mortgage and wholly neglecting to make any pro-
vision for the $2,000 of the purchase-money; and three weeks
subsequently declared that he regarded himself as free from all
obligations. I say Mr. Oakey himself took no steps in the
matter until August 29th, nearly four months after the execu-
tion of the agreement, showing that as he understood it, it was
duration of time, rather than any special limitation of it, that
each gave to the other. This left the premises of each and the
title thereto precisely as in the beginning. I cannot find that
one was a whit more responsible for the situation than the other.
The dependence was mutual, and therefore I find that the rights
and obligations were mutual, and that nothing had occurred to
create a forfeiture or warrant a rescission.

But how did the attempted withdrawal of Oakey affect the
rights of the parties? Oakey voluntarily stepped out. Having
taken that step, he had no rights under the contract which he
could enforce affirmatively. He could bring no suit in equity.

But Cook was not in such a strait. It does not always hap-
pen that a contract can be annulled at the instance of either
party so as to deprive the other of every right under it. I think
Oakey was not justified in attempting to rescind when he did,
of which more hereafter. This being so, Cook fully enjoyed all
the legal and equitable rights which he had before. Indeed, the
positive refusals of Oakey to proceed gave Cook an additional
right. It gave him the unquestioned right to institute proceed-
ings at once to compel specific performance. He need no longer
make a tender; the action of Oakey rendered that superfluous.
*Maxwell* v. *Pittenger, 2 Gr. Ch. 156, 165; Crary* v. *Smith, 2*

Oakey v. Cook.

*N. Y. 60, 65; Hunter* v. *Daniel, 4 Hare 420, 433; Fry on Spec. Perf.* § *619.*

And having the right to bring his suit at once, what is required of him in its inception and progress? Nothing more than that he shall declare himself ready and willing to perform on his part. This seems most inevitably to result from the positive refusal of the defendant to proceed. Why should anything more than readiness and willingness be required from the one party, after the other has withdrawn from the negotiation? *3 Pom. Eq.* § *1407; Huffman* v. *Hummer, 2 C. E. Gr. 263, 266; Hepburn* v. *Dunlop, 1 Wheat. 179; Selleck* v. *Tallman, 87 N. Y. 106; Fry on Spec. Perf.* § *619; Stevenson* v. *Maxwell, 2 N. Y. 408, 418; Bruce* v. *Tilson, 25 N. Y. 194, 197, 202.*

Ready and willing to do what? Clearly, ready and willing to convey to Oakey a "good and satisfactory" title to the Maryland farm upon Oakey's conveying to him a "good and satisfactory" title for the mill premises. It does not mean that Cook was not only willing, but was ready with the mortgages discharged at the time of filing his bill. In cases like this the law does not require that.

And this brings me to the application of the principle invoked by Cook: that in case of dependent covenants, neither party is bound to perform until the other does. The reasonableness of this rule appears in almost every transaction of the business world. Farmers, merchants, bankers and all other dealers act on the principle involved every day. Neither parts with his wares or money until he gets an equivalent according to the terms of the contract, whether the contract be made at the instant, or days or months antecedently. *Stevenson* v. *Maxwell, 2 N. Y. 408, 414; Irvin* v. *Gregory, 13 Gray 215, 218; Bank of Columbia* v. *Hagner, 1 Pet. 455.*

But is claimed on behalf of the defendant that the mortgages still exist against the Cook farm, and that fact is a bar. I cannot understand that any such consequence necessarily follows. The defendant having refused to go on with his contract, I think the law permitted Cook to file his bill without a tender on his part, which being so, it would seem to follow that all he need

do is to allege himself ready and willing, as has been done in this case. And this has been shown to be the law. Nor does there seem to be a doubt but that in every such case, if the complainant can make title according to the requirements of the contract at the time of the decree, the court will aid him. *Watts* v. *Waddle, 6 Pet. 389, 396, 399, 402 ; Hepburn* v. *Auld, 5 Cranch 262 ; Hepburn* v. *Dunlop, 1 Wheat. 179 ; Langford* v. *Pitt, 2 P. Wms. 629 ; Mortlock* v. *Buller, 10 Ves. 292, 315 ; Coffin* v.*Cooper, 14 Ves. 205 ; Seymour* v. *Delaney, 3 Cow. 445, 519 ; Pierce* v. *Nichols, 1 Paige 244 ; Dutch Church* v. *Mott, 7 Paige 77 ; Baldwin* v. *Salter, 8 Paige 473 ; Jenkins* v. *Fahey, 73 N. Y. 355 ; Stevenson* v. *Maxwell, 2 N. Y. 408.*

The defendant also insists that the court will not undertake to compel specific performance of this contract because of the uncertainty of its terms. Counsel admits it is certain as to subject matter, but urges that its " stipulations " are uncertain. He says that the phrase, " a good title, satisfactory to both parties," is uncertain. It seems to me that there is no uncertainty in the word " good," and that, in reason, it cannot be qualified by what follows so as to render it possible for either party to impose, or to attempt to impose, anything less than a good title on the other. Counsel brings into his service the fact that the word " clear " appears to have been written in the agreement and then erased, and the word " good " written above. He insists that this shows that the parties did not intend to convey their respective titles free from all encumbrances, and, this being so, that the court cannot compel the defendant to convey free from such encumbrances. It seems to me that the reasoning is unsound, because it is based on the theory that the word " clear " is one of the terms of the agreement, when, in fact, it was stricken out and repudiated, and also because the word " good " comprehends all that the word " clear " does. Any other word or phrase used by the parties during the negotiations for the agreement and rejected by them, might as well be invoked in aid of an affirmation or negation.

Again, it is insisted that the contract was incomplete, something remaining yet to be done, and therefore cannot be enforced.

*Potts* v. *Whitehead, 5 C. E. Gr. 55, 8 C. E. Gr. 512; Mc-
Kibbin* v. *Brown, 1 McCart. 13, 2 McCart. 498.*

The rule is quite universal, but I am unable to find the evidence upon which to rest its application in this case. The written contract does not show that the parties intended to make other or additional terms; nor, from its date to August 29th, does the evidence disclose anything which, to my mind, looks as though the parties ever intended to add another term or provision to the contract. I speak with reference to the time of making the contract. I mean to say that when the written contract was signed it was complete. There is an abundance of proof to show that the parties were willing to give time to each other to make arrangements respecting the mortgages, but that only amounts to additional time beyond what the law might adjudge as reasonable. It only implied a willingness to extend the time to carry out a bargain already completed. It in no sense signified that anything was unfinished.

But it remains to be considered whether or not the complainant is chargeable with laches. I believe there is no pretence that he was up to August 29th. In every such case, I think a good deal depends on the conduct of the party who sets up this as a defence. To my mind, Oakey did not first place himself in a position to be so exacting of Cook. When he made his tender he should have removed the mortgages from his mill, and also tendered the $5,000, or if there had been an arrangement by which the written agreement was so far modified that, say $3,000 were to be paid in cash, he certainly should have made some provision for the security of the other $2,000. This he did not do. There was no agreement or understanding that Cook should trust him for that without security. Oakey does not, it is true, so pretend, but says there was an understanding that he should leave $10,000 on his premises instead of $8,000. And taking this to have been an effectual modification of the contract, Oakey did not at any time provide for it. This fact forbids that Oakey should declare that Cook is in laches. I have looked at Oakey's rights from every conceivable position, and have been unable to discover any fact or circumstance that excuses or obviates this

default; a default only because of the position which he now assumes—not otherwise.

The last fact noticed would seem to render any further allusion to the alleged modification of the written contract, as to the manner of paying the $5,000, unnecessary; but counsel for Oakey relied so much on this branch of the case that I regard it as my duty to express my views more fully after no little attention thereto.    The fact that this did not appear in the answer, as first filed, has great weight with me.    I am quite free to say that I do not understand how a fact so conspicuous, and so important, should either be forgotten or overlooked.    I am equally free to say that this consideration induces me to believe that it never had the real prominence in the negotiations between the parties which is now claimed for it.    And all this can be said without at all impeaching the statements of Oakey or his son, as will be seen, I think.    An amendment was allowed, after the testimony was all in, against which the counsel of complainant protested. In this amendment such alleged change or modification of the contract was set forth.

But, looking at the proof, I think the allegation fails the defendant.    I cannot come to the conclusion that the parties said or did anything on this head that was mutually binding.    Taking the statement of the defendant in its broadest sense, it does not amount to a binding change in the terms of the contract; and for the reason, so palpable, that Oakey himself was not bound, he could pay or not, as he chose.

But supposing that Oakey stood by the contract in all its integrity, and that when he made the tender he did his work completely, and that nothing whatever can be charged against him, still, I do not conclude that Cook was in default in not being prepared to comply on his part August 29th, nor yet within the uncertain period named by John, nor yet on the 13th of September, when Oakey called on Cook, and asked him if he had seen Van Duzer.    Indeed, I think it does not anywhere appear that Oakey attempted to fix any certain time within which the contract was to be carried to completion.    But taking it for granted that the demand of John on August 29th was a warning that

Oakey v. Cook.

the work must all be done within a reasonable time, still I think Oakey was too hasty in withdrawing from his obligations. I can find no case which goes so far, as his contention carries him, where one of the parties to a contract, which does not make time of the essence, attempts to make time essential, has been considered by the courts. *Crawford* v. *Loodgood, L. R. (13 Ch. Div.) 153 ; Green* v. *Levin, L. R. (13 Ch. Div.) 589 ; Wells* v. *Maxwell, 32 Beav. 408, affirmed on appeal, 11 W. R. 842 ; Perkin* v. *Sharold, 16 Beav. 59 ; McMury* v. *Spicer, L. R. (5 Eq.) 527 ; Wood* v. *Macher, 5 Hare 158, 162 ; Webb* v. *Hughes, L. R. (10 Eq.) 281 ; Waterman on Spec. Perf. § 465.*

I will now direct attention to one phase of this case which has commanded the most serious consideration. Although I have alluded to it from the beginning, it deserves more special mention. I refer to the discussion which naturally arises in the mind as to the equitable standing that Cook has in this court, with the proof so full and clear that all the mortgages are still resting on his property in Maryland. When this fact first appeared in the case, I was impressed with the conviction that it was a very strong bar to Cook's progress, and was not surprised to find the result attained in *Hinckley* v. *Smith, 51 N. Y. 21.* However, upon reflection, it seems quite clear that this case is distinguishable from the one in hand in three important particulars : first, in this there was an agreement to exchange, and not a mere sale for a money consideration of premises, both heavily encumbered by mortgages ; and second, that in this, from the time that the agreement was signed until August 29th, there were several interviews between the parties with respect to some arrangement about the mortgages between them which should prove satisfactory to both ; and third, the defendant in this case had not removed the mortgage encumbrance from his mill at the time he attempted to rescind the contract. These considerations place this case on a totally different footing. Not that the court will attempt to compel Oakey to accept a title at all encumbered, but that it will, under the circumstances of this case, require him to accept an unencumbered title, if the complainant tenders such title at the time of, and in accordance with, the decree of the court.

Hence, when I have in mind the facts that both parties are vendors and both purchasers, and that they exchanged actual possession of the lands, the title to which they agreed in writing should also be exchanged, and that Oakey sold several hundred dollars worth of grain which Cook planted, the proceeds of which Oakey still holds, and that Cook has made improvements on the mill property to the value of at least $500, and that the conduct of each warranted the other in the belief that there was no pressing necessity for haste, and that neither put himself in an attitude to be very exacting of the other, I cannot but conclude that the court ought to direct the specific performance of the contract.

The defendant sought to amend his answer so that he might show a parol variation of his contract. The proposed amendment was allowed upon the ground that the parties, as it was insisted, had proceeded upon the basis of such alteration, and that such alteration had abrogated the original written agreement.

The proof does not satisfy me that there was any such alteration in any of the terms of the contract. But, supposing the alleged alteration to have been established, the fact of its existence would not destroy the original contract; but the contract with the modification would stand, and could be enforced, not, indeed, it may be, at the instance of the complainant, but upon the demand of the defendant. *Park* v. *Johnson, 4 Allen 259.*

I will advise a decree in accordance with the foregoing views. In such decree, I will name a time when and place where the parties shall meet to exchange their deeds of conveyance, and to pay and receive the consideration-money named; and as the parties live near to each other, I will make the place in the office of the mill now occupied by the complainant, and the time the thirtieth day after service of a copy of the decree upon the defendant, unless that day be Sunday, in which event then the day before, at the hour of twelve, noon.

*Mr. A. A. Clark,* for appellant.

*Mr. J. D. Bartine,* for respondent.

PER CURIAM.

This decree unanimously affirmed for the reasons given by the vice-chancellor.